1  EUGENE G. IREDALE: SBN 75292
2  JULIA YOO: SBN 231163
   GRACE JUN: SBN 287973
3  IREDALE & YOO, APC
4  105 West F Street, Fourth Floor
   San Diego, CA 92101-6036
5  TEL: (619) 233-1525
6  FAX: (619) 233-3221
7  Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT**
8  **SOUTHERN DISTRICT OF CALIFORNIA**
9

| | |
|---|---|
| 10  THE ESTATE OF JOSE<br>ALFREDO CASTRO GUTIERREZ<br>11  by and through its successor-in-<br>interest ANA CLARETH OJEDA<br>12  BENITEZ, G.D. and A.C., minors<br>through their guardian *ad litem*<br>13  ANA CLARETH OJEDA<br>14  BENITEZ, and ANA CLARETH<br>OJEDA BENITEZ as an individual,<br>15<br>16<br>17              Plaintiffs,<br>18  v.<br>19<br>20  ISAI CASTILLO  in his individual<br>capacity, DAVID LISLEIT, in his<br>21  individual capacity, CITY OF SAN<br>DIEGO, and DOES 1-25<br>22<br>23              Defendants. | CASE NO. '21 CV 1292 H    LL<br><br>**COMPLAINT**<br><br>**(1)  Excessive Force  (42 U.S.C. §1983)**<br>**(2)  Wrongful Death (42 U.S.C.§1983)**<br>**(3)  Failure to Properly Train (42 U.S.C. §1983)**<br>**(4)  *Monell***<br>**(5)  Wrongful Death (CCP §377.60)**<br>**(6)  Battery**<br>**(7)  Violation of Cal. Civ. Code §52.1 (Bane Act)**<br>**(8)  Violation of 42 U.S.C. §12101 et seq. (ADA)**<br>**(9)  Violation of 29 U.S.C. §794(a) (Rehabilitation Act)**<br><br><br>**JURY TRIAL DEMANDED** |

24
25
26
27
28

Plaintiffs, Estate of Jose Alfredo Castro Gutierrez, by and through its successor-in-interest Ana Clareth Ojeda Benitez, G.D., and A.C., minors through their guardian *ad litem* Ana Clareth Ojeda Benitez, and Ana Clareth Ojeda Benitez in her own right, allege and complain as follows:

## I.
## INTRODUCTION

On October 19, 2020, Isai Castillo, a San Diego Police Department officer had little more than one year experience in law enforcement.. On that date, he shot and killed Jose Alfredo Castro Gutierrez. Mr. Castro was experiencing a mental health crisis. The residents of the home in which he rented a room had reported that he was undergoing an emotional crisis, and that he was deeply distressed. The landlady who lived in the home described Mr. Castro as paranoid. His landlady called the Police Department, seeking help. When asked by the dispatcher if Mr. Castro had a weapon in his hands, she reported that he had no weapons of any kind; he was holding only a thin curtain rod.

Multiple police cars and at least eight police officers arrived outside the home. One policeman yelled for Mr. Castro to "come out," without further instruction. In response, Jose Alfredo emerged from the home and ran towards the group of police. Believing they were there to assist him, he yelled out "Ayuda me" (Help me). One officer shot Mr. Castro with a "beanbag" shotgun, which incapacitated him. A second officer discharged a Taser in probe mode, which applied an electric shock and immobilized Mr. Castro. Despite seeing these two officers using non-lethal force, defendant Castillo decided to use fatal force, and fired his semi-automatic pistol repeatedly, killing Mr. Castro. Defendant Castillo used lethal force on the distraught man yelling "Ayuda" – "Help." There was no need for lethal force. This needless death from multiple gunshots was entirely avoidable. In addition to the nonlethal weapons deployed, the SDPD officers had a canine available for their use, but did not wait for the dog's arrival on scene before shouting for decedent to come out of the house.

- 1

This shooting marked the tenth shooting by San Diego police in 2020. Six of these shootings were fatal. The absence of tactical planning; the improvident and precipitous use of deadly force; and the reckless failure to recognize that only less-lethal means were justified, led to Mr. Castro's death.

## II.
## JURISDICTION AND VENUE

1.      Jurisdiction is proper in the United States District Court for the Southern District of California pursuant to 28 U.S.C. §§1331, 1343(b)(4), and 42 U.S.C. §1983.

2.      This court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. §1367(a).

3.      Pursuant to 28 U.S.C. §1391(b)(1) and (2), venue is proper in the Southern District of California.

4.      Plaintiffs have complied with Cal. Gov. Code §§ 800 et seq.

5.      On behalf of the Estate of Jose Alfredo Castro Gutierrez, for Plaintiffs A.C. and G.D., and on behalf of herself, Plaintiff Ana Clareth Ojeda Benitez filed claims in compliance with California Government Code §910.

## III.
## PARTIES

6.      Decedent Jose Alfredo Castro Gutierrez was 39 years old when defendant Isai Castillo shot and killed him on October 19, 2020.  At the time of his death he had been living and working in San Diego for approximately one year. He was a legal resident of the United States.

7.      The Estate is the Estate of the decedent Jose Alfredo Castro Gutierrez. Pursuant to §377.20 of the California Code of Civil Procedure, the Estate has standing to bring claims for the torts resulting in his death.  For jurisdictional purposes, since Mr. Castro Gutierrez' death occurred in San Diego, California, the estate resides in the Southern District of California.

8.      Decedent Jose Alfredo Castro Gutierrez died intestate.

9.      Jose Alfredo Castro Gutierrez is survived by Plaintiff Ana Clareth Ojeda Benitez, his widow.  She is the successor in interest of the Estate of Jose Alfredo Castro Gutierrez.  She properly brings this action on behalf of the Estate of Jose Castro pursuant to §377.30 of the California Code of Civil Procedure. (See attached Exhibit 1, incorporated herein by reference.)

10.     As set forth in this complaint, Ana Clareth Ojeda Benitez has executed and filed the required affidavit to establish that she is decedent's successor in interest and may prosecute this action on behalf of the estate.

11.     A.C., age 2, and G.D., age 16, are the daughter and the stepson of Jose Alfredo Castro Gutierrez, respectively. Decedent provided more than one-half of the financial support for G.D. in the eighteen months before his death. They proceed through their mother and guardian *ad litem* Anna Ojeda.

12.     Defendant CITY OF SAN DIEGO (hereinafter "CITY") is, and at all relevant times mentioned herein was, a municipal entity or political subdivision of the United States, organized and existing under the laws of the State of California.

13.     Plaintiffs are informed, believe, and thereon allege that Defendant ISAI CASTILLO is, and at all relevant times mentioned herein was, a resident of the County of San Diego and State of California.  At all times relevant to the acts and omissions herein alleged, Defendant Castillo was a police officer employed by the Defendant CITY and the San Diego Police Department, and was acting under color of law and in the course and scope of his employment with the Defendant CITY and the San Diego Police Department.

14.     At all times relevant to this complaint, Defendants DOES 1-25 were San Diego police officials and other agents of the CITY OF SAN DIEGO. At all times relevant hereto, these defendants were acting in their professional capacity.

15.     Plaintiffs are ignorant of the true names and capacities of DOES 1 - 25 and/or the facts giving rise to their liability and will amend this complaint once

their identities, as well as the facts giving rise to their liability, have been ascertained.

16.     Defendants, including DOES 1 - 25 were the agents, servants and employees of each other and of the other named defendants and were acting at all times within the full course and scope of their agency and employment, with the full knowledge and consent, either expressed or implied, of their principal and/or employer. Each of the defendants had approved or ratified the actions of the other defendants, thereby making the currently named defendants herein liable for the acts and/or omissions of their agents, servants and/or employees.

## IV.
## FACTS

17.     Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein.

18.     On October 19, 2020, Isai Castillo, a San Diego police officer, shot and killed Jose Alfredo Castro Gutierrez who was experiencing a mental health crisis.

19.     The residents of the home in which he rented a room reported that he was undergoing an emotional crisis and that he was deeply distressed.  Mr. Castro appeared paranoid and had broken a window.

20.     Mr. Castro told the residents in the home that he was hearing voices of people who were yelling at him from outside the house.  He was fearful of those people he believed were yelling at him.

21.     The landlady tried to calm Alfredo Castro down and told him that the voices were from the television.

22.     The residents of the home stayed with Mr. Castro for hours as he remained fearful that there were people outside the home wanting to hurt him.

23.   The landlady called the Police Department, seeking help.  When asked by the dispatcher if Mr. Castro had anything in his hands, she reported that he had no weapons of any kind; he was holding only a thin curtain rod.

24.   Multiple police cars and at least eight police officers arrived outside the home.

25.   These officers did not wait for a sergeant to arrive to direct the scene and to formulate a response plan.

26.   Castillo, who had less than two years' experience, took charge.  It was Castillo who gave assignments to each officer as to who would have what responsibilities.

27.   These officers had a canine unit available to them and it had been summoned to the scene. For some inexplicable reason, they did not have a plan for using the canine.  They did not wait for the canine to arrive at the house before initiating contact with Mr. Castro.

28.   The landlady was outside the home to meet the officers.  They did not stop to ask her questions.

29.   There was no one inside the home who was in jeopardy.

30.   These officers could hear Mr. Castro screaming for help.  He was yelling, "Get the police!  Help!"  They saw Mr. Castro's face looking "panicked."

31.   One policeman yelled for Mr. Castro to come out, without further instruction.  He yelled loudly to Mr. Castro who was already paranoid and fearful of people whom he believed were yelling at him from outside the house.

32.   The officers, including Castillo, did not wait until all officers were situated to contain the scene.  At least one officer, who used the beanbag shot gun, had to jog to catch up with the other officers.  Instead of waiting for all officers and the canine to take their place, Castillo immediately started ordering Mr. Castro to come out of the house.

33.     Castillo, instead of taking cover and placing himself in a position of safety, walked up the sidewalk.  Other officers then had to follow him onto the sidewalk, instead of behind a row of cars where they would have been afforded cover.

34.     In response to the loud yelling by the officer, Jose Alfredo emerged from the home and ran towards the group of police, believing they were there to assist him.

35.      Officers are trained that when dealing with emotionally charged events, they should speak in a calm, clear voice and give specific instructions as to how the person should conduct himself, e.g. "come out of the house slowly with your hands raised, stop at the gate, stand still."  In this case, the officers including Castillo, ignored this training.

36.     Mr. Castro was yelling "Ayuda" – "Help," as he ran out of the house.

37.     Defendant Castillo, by placing himself and others onto the sidewalk, then yelling at Mr. Castro to come out of the house, created the situation in which the panicked Mr. Castro would run to him.

38.     One officer shot Mr. Castro with a round from a "beanbag" shotgun. Another shot Mr. Castro with a Taser in probe mode.

39.     There was clearly no need to use lethal force.  At least three police officers had their Tasers out and ready for use when Castillo shot and killed Mr. Castro.

40.     Defendant Castillo, who had arrived on the scene less than sixty seconds before he discharged his firearm, decided to use lethal force on the distraught Alfredo Castro.  This needless death from multiple gunshots was entirely avoidable.

41.     At the time of the shooting, there were no civilians near Mr. Castro.

42.     At the time of the shooting, the officers had non-lethal weapons available, including the beanbag shotgun, the Taser and a K9.

43. The other two officers used non-lethal weapons. There was no objective necessity for a fatal use of force on an emotionally distraught man yelling "help."

44. A fourth officer, who was standing behind Defendant Castillo, pulled out her Taser when she saw Mr. Castro running out of the home. She did not deploy the Taser. A fifth officer likewise drew her Taser but did not use it.

45. The use of deadly force by Defendant Castillo on Mr. Castro was unnecessary. It was unjustified under California Penal Code §835a, the state statute governing when a peace officer may use deadly force.

46. Section 835a, which became effective on January 1, 2020, clearly specifies that a law enforcement officer may use deadly force only when the officer reasonably believes, based on the totality of the circumstances, that such force is necessary, either to defend against an imminent threat of death or serious bodily injury to the officer or another person, or to apprehend a fleeing person for a felony that threatened or resulted in death or seriously bodily injury.

47. Under the Fourth Amendment and clearly established law, a police officer may not use deadly force unless there is an imminent threat of death or serious bodily injury to the officer or another.

48. Mr. Castro did not present an imminent threat of death or serious bodily injury to the officer or another.

49. Based on the totality of the circumstances, including the video evidence, witness statements, and autopsy report, it is clear that Defendant Castillo applied an excessive and unreasonable level of force that resulted in the death of Mr. Castro.

**FIRST CAUSE OF ACTION**
**(Excessive Force (42 U.S.C. §1983))**
**[By the Estate Against Defendant Castillo and Does]**

50. Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein by this reference.

51.     The Fourth Amendment prohibits the use of excessive force by police officers as unreasonable seizures.

52.     Clearly established law prohibited Defendant Castillo from using fatal force against Mr. Castro, when he was clearly carrying no weapon, was not assaulting Castillo or anyone else, and did not represent a threat of death or serious bodily injury.

53.     While acting under color of law, in uniform, and with a City issued firearm, Castillo shot and killed Mr. Castro, who was screaming for help during a mental health crisis.

54.     Castillo was acting within the course and scope of his employment by the San Diego Police Department.

55.     Castillo's actions under color of law violated decedent's Fourth Amendment rights and caused his death.

56.     As a result of Castillo's conduct, Mr. Castro suffered pain, fear and shock, and lost his life.

57.     Castillo's actions were oppressive, malicious and in reckless disregard of Mr. Castro's Fourth Amendment rights.

58.     The conduct of Defendant Castillo and DOES 1-25 as set forth herein was a substantial factor in causing the death of Mr. Castro.

59.     As a direct and proximate result of the unlawful acts, excessive force, unlawful seizure and recklessness described above, decedent Jose Castro suffered severe injuries and loss of his life. His estate is entitled to general, compensatory, and punitive damages in an amount to be proven at trial.

**SECOND CAUSE OF ACTION**
**(Wrongful Death (42 U.S.C. §1983))**
**[By the Estate against Defendant Castillo and Does]**

60.     Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein by this reference.

61.     Defendant Castillo committed wrongful acts which proximately caused the death of Jose Alfredo Castro.  Defendant Castillo was deliberately indifferent to Mr. Castro's health and safety; he violated Mr. Castro's Fourth Amendment rights; and used excessive and unnecessary force, causing the untimely and wrongful death of Mr. Castro.

62.     Defendant Castillo deprived Mr. Castro of his rights under the Fourth Amendment to the United States Constitution in using excessive force, and causing his death.

63.     These wrongful acts were done with a deliberate indifference to the safety and welfare of Mr. Castro.

64.     The conduct alleged herein violated Mr. Castro's rights alleged above thereby resulting in a deprivation of Plaintiffs' rights alleged above which has legally, proximately, foreseeably and actually caused Plaintiff to suffer emotional distress, pain and suffering, and further general and special damages according to proof at the time of trial.

65.     Castillo acted oppressively, maliciously and in reckless disregard of Mr. Castro's rights.

66.     The conduct alleged herein violated Jose Castro's rights alleged above thereby resulting in a deprivation of Plaintiffs' rights alleged above which has legally, proximately, foreseeably and actually caused Plaintiff to suffer emotional distress, pain and suffering, and further general and special damages according to proof at the time of trial.

## THIRD CAUSE OF ACTION
### (Failure to Properly Train (42 U.S.C. § 1983))
### [By All Plaintiffs against Defendant Nisleit]

67.     Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein by this reference.

68.     Officials of the San Diego Police Department, acting under color of law, have subjected decedent Jose Alfredo Castro and other persons similarly

situated to a pattern of conduct consisting of continuing, widespread and persistent pattern of unconstitutional misconduct.

69.   Defendant Nisleit failed to maintain adequate and proper training necessary to educate officers as to the Constitutional rights of arrestees and other members of the public.

70.   There has been an official policy of acquiescence in the wrongful police conduct resulting in serious injury or death.

71.   Nisleit had a responsibility to properly train officers about the appropriate use of force.  He had an obligation to ensure that his officers had proper training on de-escalation.  He had an obligation to ensure that his officers had proper training on dealing with the mentally ill, which is a recurring situation. Nisleit and Does failed to train officers on how to properly use firearms despite the fact that these officers were given firearms to use within the scope of their employment.

72.   Encountering individuals with mental illness is a recurring situation police officers must face every day.  The City and supervisory defendants were well aware of the need to train their officers on the proper way to deal with the mentally ill to avoid fatal confrontations as this one.

73.   Across the country, approximately twenty (20) percent of fatal shootings involve someone who has mental health problems.

74.   Despite the obvious need to train his officers on de-escalation tactics, Nisleit failed to train despite multiple incidents of past excessive use of force on the mentally ill.

75.   These occurrences in which the San Diego police officers shot a person in psychiatric crisis include, but are not limited to, the following:

     a.   On April 30, 2015, Fridoon Nehad was gunned down and killed within just minutes of Officer Neal Browder arriving on the scene.  Fridoon, who was unarmed, was

mentally ill. He presented no threat to anyone. No one was within the vicinity. Officer Browder shot Firdoon within seconds of getting out of his patrol car.

b. On August 24, 2019, San Diego police officers went to a home of a mentally ill man and shot him dead. Dennis Carolino was reported by family as being mentally ill and having an episode. Instead of waiting for professionals at PERT to arrive to calm Dennis down, several officers went into the dark backyard where Dennis was hiding. When Dennis came running out with a shovel, they shot him dead.

c. In 2021, an officer shot and injured a 69 year old homeless man who was standing on the sidewalk, eating. Mr. Stephen Wilson had not committed any crimes and he was doing nothing but eating his dinner. The officer who knew Mr. Wilson had a knife in his back pocket shot him when he took the knife out and threw it onto the ground. Mr. Wilson presented no threat and was making no threatening movements at the time of the shooting.

76.    The training policies of Defendant City of San Diego (CITY) were not adequate to train its officers to handle the usual and recurring situations with which they must deal.

77.    The City was well aware from the Nehad case that their training with respect to de-escalation was grossly insufficient. The City learned through its litigation that a review of SDPDD officer involved shootings showed that 75% of the shootings appeared to be avoidable through the use of reasonable tactics. The City knew that in 70% of the shootings, the citizen did not have a firearm.

78.    The expert retained by Mr. Nehad who reviewed 20 cases of officer involved shootings and determined that only a quarter of the shootings appeared to be necessary. In 60% of these cases, the citizens were killed. The City was well aware of this review before the shooting of Mr. Castro.

79. Even after Mr. Nehad, who was holding a pen, was shot to death, the City took no action to discipline Officer Browder who killed Mr. Nehad or to improve its training.

80. The City was on notice that the proper practices in policing included 1) locating and asking reporting parties about allegations regarding a possible weapon; 2) staying in "cover" and always avoiding standing in the open; 3) remaining in position of safety (cover) and using the time cover provides to make an accurate assessment of any perceived threat; 4) not using lethal force unless it is required by an immediate defense of life; and 5) not using lethal force absent obvious reasonable alternatives.

81. The City failed to train the defendant officers these practices despite a series of unjustified shootings.

82. Defendant City, together with other City policymakers and supervisors, maintained the following unconstitutional customs, practices, and policies:

    a. Using excessive force on individuals who do not pose a risk of imminent death or serious bodily injury to themselves or others;

    b. Providing inadequate training regarding the use of force, including deadly force;

    c. Inadequately supervising, training, controlling, assigning, and disciplining officers, including Defendant Castillo;

    d. Maintaining a policy of inaction and an attitude of indifference towards use of excessive force, including by failing to discipline, retrain, investigate, and terminate officers who cause the deaths of unarmed, nonviolent, compliant, and/or mentally ill people. This creates a culture of lawlessness where officers are free to act with impunity and thus continue to violate arrestees' Constitutional rights.

83. The City's deficiencies included allowing the use of unlawful and unnecessary force and failing to investigate and discipline officers for the use of

such force.  There was a custom and practice of resorting to use of force on mentally ill patient/inmates who needed psychiatric help, not use of force.

84.    By reason of the aforementioned acts and omissions, Plaintiffs have suffered loss of the love, companionship, comfort, care, society, training, guidance, and past and future support of Jose Castro.

85.    The aforementioned acts and omissions caused Jose Castro's pain and suffering, loss of life, loss of enjoyment of life, and death.  As a direct, proximate and foreseeable result, Plaintiff suffered damages in an amount according to proof at the time of trial.

86.    The failure of all supervisory defendants to promulgate or maintain constitutionally adequate training was done with deliberate indifference to the rights of Jose Castro and others in his position.

87.    As a direct consequence of the failure of Defendants to properly train their officers, including Castillo, Jose Castro suffered unconstitutional treatment and died.

88.    As a result, decedent Jose Castro suffered physical and psychological injuries and death, and his wife and children lost their relationship with their husband and father.

### FOURTH CAUSE OF ACTION
### (*Monell* (42 U.S.C. § 1983))
### [By All Plaintiffs against Defendant City of San Diego]

89.    Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein by this reference.

90.    Defendant CITY, together with other CITY policymakers and supervisors, maintained the following unconstitutional customs, practices, and policies:

      a.  Providing inadequate training regarding the use of force, including deadly force;

      b.  Providing inadequate training on de-escalation;

c. Inadequately supervising, training, controlling, assigning, and disciplining CITY officers, including Castillo; and

d. Maintaining grossly inadequate procedures for reporting, supervising, investigating, reviewing, disciplining, and controlling misconduct by CITY officers, including Castillo.

91.     There was a custom and practice of not properly utilizing and requesting the specialized services of PERT (Psychiatric Emergency Response Team). As a direct result, Defendant Castillo chose not to request assistance from PERT.  A trained PERT technician would have been able to defuse the situation instead of escalating it.

92.     The City by refusing to discipline these defendants, including Defendant Castillo, ratified their actions.  The City has a long history of ratifying the wrongful conduct of its officers involved in unjustified killings.  This includes Officer Scott Holslag, who twice shot unarmed men only to claim that he was in fear for his life believing the citizens to be armed with non-existent guns.  The City refused to discipline Officer Brower who shot and killed Mr. Nehad and claimed that a pen in Mr. Nehad's hand was a gun.  Upon information and belief, none of the officers involved in the 75% of officer involved shootings that could have been avoided was disciplined or terminated.

93.     This failure to properly investigate and discipline officers led to the systemic use of unnecessary force.  In turn, it caused the officers in this case to use unnecessary and fatal force.

94.     Officials of the San Diego Police Department, acting under color of law, have subjected decedent Jose Castro and other persons similarly situated to a pattern of conduct consisting of continuing, widespread and persistent pattern of unconstitutional misconduct.

**FIFTH CAUSE OF ACTION**
**(Wrongful Death– CCP §377.60 *et seq.*)**
**[By Ana Benitez, A.C. and G.D. against All Defendants]**

- 14

95.    Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein by this reference.

96.    Defendants had a duty to Jose Castro to act with ordinary care and prudence so as not to cause harm or injury to another.

97.    Defendant Castillo improperly, negligently, wrongfully, and recklessly used excessive and unreasonable force against Jose Castro.

98.    As a direct and proximate result of the Defendants' negligent conduct as herein described, Jose Castro suffered physically and mentally in the amount to be determined at the time of trial.

99.    As a further proximate result of the Defendants' negligent conduct, Jose Castro died.

100.   All claims asserted herein against the Defendant City are presented pursuant to the City's vicarious liability for acts and omissions of municipal employees undertaken in the course and scope of their employment pursuant to California Government Code §§815.2(a) and 820(a).

101.   Defendant Castillo, while acting under color of law and in the course and scope of his employment with the Defendant City and the San Diego Police Department, negligently discharged his department-issued firearm at the person of Jose Castro, inflicting multiple gunshot wounds, killing Mr. Castro.  Jose Castro died as a direct and proximate result of the gunshot wounds negligently inflicted.

102.   Defendant Castillo had a duty to exercise the reasonable care which would be expected of a similarly situated peace officer in the use of deadly force, and had a duty to exercise the reasonable care which would be expected of similarly situated peace officers in the execution of police tactics and procedures in approaching and/or attempting to detain civilians and suspects who do not pose a risk of death or serious bodily injury to any person.

103.   Castillo failed to exercise reasonable and ordinary care in committing the acts alleged herein, by actions and inactions which include, but are not limited

- 15

to: negligently failing to utilize additional departmental resources during the incident involving Mr. Castro; negligently failing to utilize available forms of cover during the incident involving Jose Castro; negligently failing to communicate and/or effectively communicate with departmental personnel on scene and other departmental personnel and resources during the incident involving Jose Castro; negligently failing to utilize less lethal force options and other alternatives less intrusive than deadly force during the incident involving Jose Castro; negligently failing to utilize and/or appropriately utilize less lethal force options and other alternatives less intrusive than deadly force during the incident involving Jose Castro; negligently employing a tactical response during the incident involving Jose Castro that resulted in the unnecessary and preventable shooting of Jose Castro; negligently failing to determine the fact that Plaintiff posed no immediate threat to the safety of any person when he was shot; and negligently using deadly force against Jose Castro.

104.   Castillo and Doe defendants knew that the call for help came from people who were living in the home with Mr. Castro.  They knew that this was a call for mental health help.  They had been advised that while Mr. Castro was breaking windows, he had not physically harmed anyone.

105.   They knew that Mr. Castro was unarmed that he only had a thin curtain rod.  These defendants when arriving at the scene, failed to make contact with the residents, or to ascertain what had been happening since the 911 call was made.

106.   They walked past the landlady who was specifically standing outside to speak with them.  They simply approached the house to yell at Mr. Castro to come out of the house.

107.   No one set a perimeter and coordinated the use of force.  The officers did not communicate with each other about what weapons would be used.  Castillo did not know, because he did not inquire, which officer would be responsible for the use of force and which officer would communicate with Mr. Castro.

- 16

108.   Nobody called for PERT assistance.  Nobody spoke with the residents who had called to see if the situation in the house had calmed down, whether anyone was injured, whether anyone had been threatened, and whether Mr. Castro would come outside voluntarily.

109.   After they yelled at him to come out of the house, Mr. Castro came out of the house, holding the curtain rod, as they knew he would because they were already advised he was holding a curtain rod.  As a result of Mr. Castro doing what he was told to do, he was shot and killed.   These defendants are liable for their pre-shooting tactical errors which set off the chain of events in which Mr. Castro would predictably become a victim of the use of force.

110.   As a result of these actions and failures, Jose Castro was killed.

111.   Plaintiffs have sustained substantial non-economic damages resulting from the loss of the love, companionship, comfort, care, assistance, protection, affection, society, moral support, training, guidance, services, and support of Jose Castro in an amount according to proof at trial.

### SIXTH CAUSE OF ACTION
### (BATTERY)
### [By the Estate Against Castillo]

112.   Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein.

113.   The acts alleged herein resulted in the death of Mr. Castro.

114.   The City of San Diego is responsible for the acts of employees and agents including Castillo under the theory of *respondeat superior*.

115.   The wrongful acts alleged above has destroyed the relationship between Plaintiff and Jose Castro and has legally, proximately, foreseeably and actually caused severe emotional damages, including the loss of society, companionship, emotional distress, and further economic and non-economic damages according to proof at the time of trial.

- 17

116.   Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein by this reference.

117.   All claims asserted herein against the Defendant City are presented pursuant to the City's vicarious liability for acts and omissions of municipal employees undertaken in the course and scope of their employment pursuant to California Government Code §§815.2(a) and 820(a).

118.   Defendant Castillo, while acting under color of law and in the course and scope of his employment with the Defendant City and the San Diego Police Department, Castillo assaulted and battered Jose Castro, by acts which included, but were not limited to, unjustifiably discharging his department-issued firearm at the person of Jose Castro, which proved to be fatal.

119.   Jose Castro did not pose any threat of death or serious bodily injury to Castillo, nor did he do anything to justify the force used against him.  Jose Castro was unarmed and posed no threat of death or serious bodily injury to Defendant Castillo, nor to any person.

120.   Jose Castro did not consent to the offensive touching.

## SEVENTH CAUSE OF ACTION
### (Violation of Civil Rights Cal. Civ. Code § 52.1)
### [By the Estate against All Defendants]

121.   Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein by this reference.

122.   Defendant Castillo interfered by threats, intimidation, or coercion, with the exercise or enjoyment of Jose Castro's rights secured by the Constitution or laws of the United States, and the Constitution and laws of the State of California.

123.   The Fourth and Fourteenth Amendments to the U.S. Constitution, and Article I, section 13 of the California Constitution, guarantee (a) an individual's

right to be free from excessive force and (b) parents' rights to the companionship of their child.

124.   California Civil Code section 43 confers a right to be secure in one's bodily integrity from assault and excessive force.  By engaging in the acts alleged above, Defendants denied those rights to Plaintiff, thus giving rise to claims for damages pursuant to California Civil Code section 52.1.

125.   As a direct and proximate result of Defendants' actions, as alleged herein, Plaintiff was injured as set forth above and is entitled to damages, including compensatory and punitive damages, in an amount to be proven at trial and in excess of the jurisdictional amount required by this Court.

126.   In conducting himself as alleged herein, Defendant Castillo was acting within the course and scope of their employment with Defendant City of San Diego. Thus, the City is responsible for Defendant's actions.

127.   In doing the foregoing wrongful acts, Defendant acted in reckless disregard for Plaintiffs' constitutional rights. The wrongful acts, and each of them, were willful, oppressive, fraudulent and malicious, thus warranting the imposition of punitive damages against Defendant Castillo in an amount adequate to punish the wrongdoers and deter future misconduct.

128.   Castillo also acted with specific intent to use deadly force, which was greater force than was objectively reasonable and necessary.

129.   As a direct and proximate result of the wrongful, intentional, and malicious acts and omissions of Defendant Castillo, decedent Jose Castro was shot and killed.

130.   Plaintiffs are entitled to and hereby demand costs, attorneys' fees, and expenses pursuant to Cal. Civ. Code §52.1

## EIGHTH CAUSE OF ACTION
### (Violation of the Americans With Disability Act of 1990

- 19

**42 U.S.C. 12101, *et seq*.)**
**[By the Estate against the City of San Diego]**

131.   Plaintiffs reallege all prior paragraphs of this complaint and incorporates the same herein by this reference.

132.   Pursuant to 42 U.S.C. § 12132, "Subject to the provisions of this title, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."

133.   Under Title II of the Americans with Disability Act, public entities are required to make reasonable modifications to avoid discrimination on the basis of disability.   The ADA sets an affirmative requirement to act appropriately with respect to prisoners with mental disabilities.

134.   ADA creates an affirmative duty in some circumstances to provide special treatment, or "reasonable accommodation."

135.   Facially neutral policies may violate the ADA when such policies unduly burden disabled persons, even when such policies are consistently enforced.

136.   Discrimination includes a defendant's failure to make reasonable accommodations to the needs of a disabled person based on his mental health. These accommodations include training on how to deal with the mentally ill, heightened level of medical care, and diligent surveillance.

137.   Pursuant to 42 U.S.C. § 12132, "Subject to the provisions of this title, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."

138.   Under Title II of the Americans with Disability Act, public entities are required to make reasonable modifications to avoid discrimination on the basis of disability.   The ADA sets an affirmative requirement to act appropriately with respect to prisoners with mental disabilities.

139.   ADA creates an affirmative duty in some circumstances to provide special, preferred treatment, or "reasonable accommodation."

140.   Facially neutral policies may violate the ADA when such policies unduly burden disabled persons, even when such policies are consistently enforced.

141.   Discrimination includes a defendant's failure to make reasonable accommodations to the needs of a disabled person based on his mental health. These accommodations include training on how to deal with the mentally ill, heightened level of medical care, and diligent surveillance.

142.   Jose Alfredo Castro was a disabled individual suffering from a mental impairment that substantially limited one or more major life activities.   Jose Alfredo Castro was a "qualified individual with a disability" for purposes of the Americans with Disabilities Act and the Rehabilitation Act.

143.   The San Diego Police Department is a "public entity" for purposes of the Americans with Disabilities Act and the Rehabilitation Act.

144.   A person has a disability if he/she has a physical or mental impairment that substantially limits one or more major life activities, a record of such impairment, or is regarded as having impairment.  It was well documented that Jose Castro was diagnosed with schizophrenia and he was unable to care for himself.

145.   Defendants denied Jose Castro benefits of the services, programs or activities of the because of his disability and subjected him to discrimination.

146.   Doe Defendants failed to make reasonable accommodations to Jose Castro's medical needs based on his mental health.

147.   Defendants denied Jose Castro benefits of the services, programs or activities including a transfer to a mental health facility, which is the services, programs or activities they provide.

148.   There was an outright denial of services when Mr. Castro was exhibiting obvious symptoms of mental illness.  This demonstrates that Defendants were discriminating against Jose Castro because of his disability.

149.   Defendants violated Jose Castro's clearly established rights under the ADA.

150.   As a direct and proximate result of the Defendants' conduct as herein described, Jose Castro suffered damages in the amount to be determined at the time of trial.

NINTH CAUSE OF ACTION

**(Violation of the Rehabilitation Act 29 U.S.C. § 794(a))**
**[By the Estate against the City of San Diego]**

151.   Plaintiffs reallege all prior paragraphs of this complaint and incorporates the same herein by this reference.

152.   The Rehabilitation Act of 1973 ("Section 504") states in pertinent part, provides that "No otherwise qualified individual with a disability in the United States  . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . ." 29 U.S.C. § 794(a).

153.   Defendant San Diego Police Department is a program that receives federal financial assistance as defined in 29 U.S.C. § 794(b).

154.   Jose Castro was a "qualified individual with a disability" under the Rehabilitation Act.

155.   Defendant violated the Rehabilitation Act by failing to make reasonable accommodations to the needs of Jose Castro, a disabled person.  It was a reasonable accommodation to transfer a schizophrenic patient to a mental health facility where he could receive necessary services.

156.   Employees of Defendant San Diego Police Department were deliberately indifferent to Jose Castro's serious medical condition.  They failed to consider obvious symptoms of Jose Castro's mental health condition when they rushed to the house without any mental health expert or specialist through PERT.

157.   Defendants improperly and wrongfully subjected Jose Castro to arrest for a criminal charge instead of taking him to a mental health care facility.

158.   Doe Defendants #1 and #2 improperly, negligently, wrongfully, and recklessly failed to transport Jose Castro to a psychiatric care facility and instead transported him to jail for booking.

159.   Defendant failed to accommodate Jose Castro with the services and programs available to mental health patients.  There were services readily available to Jose Castro, which was a providing mental health services through PERT and a placement in a mental health hospital.

160.   As a direct and proximate result of the Defendants' conduct as herein described, Jose Castro suffered damages in the amount to be determined at the time of trial.

**WHEREFORE**, Plaintiffs pray as follows:

1.      For general and special damages according to proof at the time of trial;

2.      For attorneys' fees and costs of suit and interest incurred herein;

3.      For punitive damages against individual defendants; and

4.      Any other relief this court deems just and proper.

**DEMAND FOR A JURY TRIAL**

Pursuant to Rule 38 of the Federal Rues of Civil Procedure and the Seventh Amendment to the Constitution, Plaintiffs hereby demand a jury trial of this action.

Respectfully Submitted,
**IREDALE AND YOO, APC**

Dated:  July 19, 2021

s/ *Eugene Iredale*
EUGENE IREDALE
Attorney for Plaintiffs